**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

OSBORNE ASSOCIATES, INC.,
d/b/a Generations Salon Services,

        Plaintiff,

v.                                Case No. 3:17-cv-1135-J-34MCR

SHERYL CANGEMI, JULIE CALIANNO,
and SILVER SALONS & SPAS, LLC

        Defendants.
_____/

# O R D E R

**THIS CAUSE** is before the Court on Plaintiff's Verified Complaint and Demand for Jury Trial (Doc. 1; Complaint), filed on October 10, 2017, and Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Incorporated Memorandum of Law (Doc. 3; Motion) filed on October 11, 2017.  Defendants filed a response in opposition to the Motion on October 26, 2017, <u>see</u> Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 21; Response), and in accordance with the Court's Order (Doc. 16; Briefing Order), Plaintiff filed a reply on October 31, 2017, <u>see</u> Plaintiff's Reply to Defendants' Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 24; Reply).  The Court held a hearing on November 2, 2017, during which the Court heard testimony from two witnesses and oral argument from counsel.[1]

---

[1] In entering the Briefing order, the Court did not anticipate receiving testimony.  However, during the Preliminary Injunction Hearing the Court identified certain material factual disputes that merited the presentation of evidence to allow the Court to make the required factual findings.

## I.    Procedural History

After filing the Complaint, Plaintiff Osborne Associates, Inc., d/b/a Generations Salon Services (Generations Salon or Plaintiff) filed a Motion to Expedite Discovery (Doc. 4; Motion to Expedite) on October 11, 2017.  Prior to receiving leave of court to expedite discovery, Generations Salon proceeded to serve a subpoena on a current client of Defendant Silver Salons & Spas, LLC (Silver Salons).  <u>See</u> Sheryl Cangemi, Julie Calianno and Silver Salons & Spas, LLC's Response in Opposition to Plaintiff's Motion for Expedited Discovery and Request for Sanctions, ¶¶ 11-13 (Doc. 22; Defendants' Response and Request for Sanctions), filed October 26, 2017.  Generations Salon's service of that subpoena prompted Defendants to file a motion for sanctions.  On October 30, 2017, the assigned magistrate judge denied Plaintiff's Motion to Expedite and took Defendants' request for sanctions under advisement.  <u>See</u> Order Denying Motion to Expedite and Taking Under Advisement Motion for Sanctions (Doc. 23; Order Denying Motion to Expedite).[2]  The following day, Generations Salon filed its Reply.  With the Reply, Generations Salon included as exhibits some of the documents and information it obtained as a result of the subpoena.  <u>See</u> Reply, Attach. 1, Exs. B – D.  In response, on November 1, 2017, Defendants filed a Motion to Treat Documents as Non-Trade Secrets and a Second Request for Sanctions Against Plaintiff (Doc. 25; Motion to Treat Documents as Non-Trade Secrets).  There, Defendants contended that many of the documents Generations Salon included in its Reply contained un-redacted information Generations Salon was otherwise claiming as trade secrets in this action.  <u>Id.</u> at ¶¶ 6-7.

---

[2] Plaintiff's Motion to Expedite and the Defendants' Response and Request for Sanctions, are currently before the magistrate judge.  <u>See</u> Order Denying Motion to Expedite.

Additionally, Defendants reasserted their request that sanctions be imposed on Generations Salon for the premature issuance of the subpoenas. Id. at ¶ 8.[3]

At the Preliminary Injunction Hearing, without determining the ultimate propriety of the issuance of the subpoenas, the Court ruled that the documents obtained by Generations Salon by virtue of the subpoena would not be considered by the Court for the purposes of resolving the Motion. Specifically, those documents included exhibits B – D, which were part of Attachment 1 of Plaintiff's Reply. Reply, Attach. 1, Exs. B – D. However, the Court declined to treat all the information contained in Generations Salon's Reply as non-trade secrets, or to impose sanctions on Generations Salon, noting that the question of sanctions was already before the assigned magistrate judge.[4] In light of the fact that the Court will not consider the information contained in the Plaintiff's Reply, Attachment 1, Exhibits B – D, the Court will also not consider any arguments of the parties that stem from those documents.

## II.    **Background**[5]

Over the last 25 years, Generations Salon has provided professional salon and spa services to residents in senior living facilities, personal care and assisted living communities, as well as health care and nursing centers. Complaint at ¶ 1, ¶¶ 21-22. Generations Salon has over 300 on-site salons nationwide and services over 30,000

---

[3] Defendants also asked the Court to deny the Motion for preliminary injunctive relief. Id. at ¶ 8.
[4] As to the matter of sanctions, the Court noted that Defendants' request was duplicative of its motion pending before the magistrate judge, and as such would be resolved by the magistrate judge.
[5] The Court notes that, as the Motion is one for preliminary injunctive relief and is necessarily before the Court on an expedited schedule, the factual record contained herein may not be completely developed. Therefore, the following facts and conclusions of law do not necessarily reflect what may be established on a record more fully developed following trial on these issues. Accordingly, the determinations in this Order are expressly limited to the record before the Court at this time and should not be interpreted as a final decision regarding any disputed issues of fact.

residents each month. Id. at ¶ 2.  It operates salons in Florida, Pennsylvania, New York, New Jersey, Delaware, Maryland, Virginia and Texas.  Id. at ¶ 4.

Generations Salon hired Defendant Sheryl Cangemi ("Cangemi") on March 2, 2016, id., Exhibit A at 5, to be its Director of Business Development.  Id. at ¶ 3.  In her position, Cangemi "was responsible for high level contacts with decision makers, seeking out, maintaining, and developing business relationships with senior living communities, stylists, and cosmetologists" in at least the state of Florida.  Id. at ¶ 4.[6]  Generations Salon hired Defendant Julie Calianno ("Calianno") in March of 2016 as a Regional Operations Manager.  Id. at ¶ 5; id. at Exhibit B at 1.[7]  Calianno oversaw operations in the Pennsylvania region.  Id. at ¶ 5, 31-32.  By virtue of their respective positions, both women had access to information relating to Generations Salon's "customers, stylists, key personnel, the terms of its contracts with senior living communities, pricing, suppliers, marketing strategies and prospective customer pipeline, among other types of information."  Id. at ¶ 3.[8]

Before working for Generations Salon, Cangemi had at least 14 years' experience in the senior salon services industry.  Response, Attach. 1, Cangemi Decl. ¶ 3 (Cangemi Decl.).  Immediately prior to her employment with Generations Salon, she was an independent contractor performing salon services at Bay View Healthcare (Bay View). Redacted Transcript of Preliminary Injunction Hearing held on November 2, 2017 at 4-5,

---

[6] Generations Salon contends that Cangemi's responsibilities extended throughout its geographic area. Cangemi disputes this, and contends she focused on Florida.  Response, Attach. 1 at ¶ 7 (Cangemi, Decl.).
[7] In her Declaration, Calianno avers that she was hired as Generations Salon's Director of Business Development.  Response, Attach. 2, Calianno Decl. ¶ 4 (Calianno Decl.).  This appears to be a mistaken carry-over from Cangemi's declaration, as the two are almost identical. Id., Cangemi Decl. ¶ 4. The correct title for Calianno appears to be Regional Operations Manager.  Complaint at ¶ 5.
[8] Cangemi and Calianno deny having any customer list or seeing any list of stylists and also generally deny "learning anything" from Generations Salon. Cangemi Decl. at ¶ 8; Calianno Decl. at ¶ 9.  However, they have not disputed that they had access to the information described.

9-10 (Doc. 30; Tr.), filed on November 6, 2017.  At Bay View, Cangemi was the sole stylist and was working as an individual, not as an owner of a company.  Id. at 4, 9-10.  Indeed, she had not set up a company.  Id. at 9.  Prior to that, Cangemi had worked for at least one other senior salon service provider in the industry, Salon PS.  Cangemi Decl. ¶ 8, 10.  Calianno had also worked for Salon PS, and prior to joining Generations Salon, she had worked for Salon PS for approximately three years.  Calianno Decl. ¶¶ 3, 9.[9]  Neither Cangemi nor Calianno presented evidence that either had experience in marketing or negotiating contracts for the operation of on-site salons within senior or assisted living communities, or management of such salons before joining Generations Salon.

As a condition of employment with Generations Salon, both women signed Non-Compete agreements which restricted each from:

> working in a competitive capacity for a period of one year following termination of employment; soliciting any client, customer, officer, staff, or employee of Generations Salon for her own benefit or for the benefit of a third-party that is engaged in a similar business to Generations Salon; and using or disclosing Generations Salon's confidential and proprietary information.

Complaint at ¶ 6; id. at Exhibit A & B.[10]  However, given the relationship Cangemi already had with Bay View, Generations Salon and Bay View altered the standard language in the contract between Bay View and Generations Salon which stated:

> [d]uring the term of this agreement [Bay View] agrees to use the exclusive services of [Generations Salon] for all of its hair grooming requirements.  [Bay View] agrees not to approach [Generations Salon's] agents for the purpose of engaging their services directly or indirectly during the term of this agreement and for a twelve-month period after the termination of this agreement.

---

[9]  Although Calianno also states that she owned her own salon for eight years, it appears that this was not in the senior salon services industry as she affirmatively states she had been in the industry for approximately five years as of the date of her declaration.  Calianno Decl. ¶ 3.
[10]  The parties agree that Cangemi's agreement, which was entered into in Florida, is governed by Florida law, and Calianno's agreement, which was entered into in Pennsylvania, is governed by Pennsylvania law.

Reply, Attach. 2, Ex. B at ¶ F. Next to this language, both the party negotiating on behalf of Bay View, and Marvin Weinstein, President of Generations Salon, initialed a notation that stated "This would not apply to Sheryl Cangemi." Id. Thus, the agreement between Bay View and Generations Salon provided that Cangemi "could go work for Bayview, notwithstanding the fact that language in [Generations Salon's] contract with [Bayview]" would prevent Bay View from hiring any Generations Salon employees. Id., Attach. 2 at ¶ 8. Cangemi construes the Bay View agreement to suggest that should Cangemi leave Generations Salon, the contract between Bay View and Generations Salon would end, and "Bayview would come with [her.]" Cangemi Decl. at ¶ 10. However, the record before the Court does not support Cangemi's interpretation of the Bay View and Generations Salon agreement. Nor does the copy of Cangemi's fully executed covenant-not-to-compete support such an interpretation. Complaint, Attach 1.[11]

Cangemi left her employment with Generations Salon on January 26, 2017, and Calianno followed shortly after that. Tr. at 11; Calianno Dec. at ¶ 4. Prior to leaving Generations Salon, and unbeknownst to their employer, the women formed Silver Salons in November 2016. Neither informed Generations Salon of where she actually intended to work following her resignation, or that the two had formed Silver Salons. Complaint at

_____

[11] With her Response, Cangemi attached a signature page for the non-compete agreement bearing only her signature and a handwritten notation initialed only by her which reads: "If the parties at any point, dissolve their business relationship, the contract between Generations Salon Services and Bay View Healthcare, St. Augustine Fl., will be relinquished and returned solely to Sheryl Cangemi." Response, Attach. 4 at 3. At the hearing, Cangemi testified that she wrote the notation on the non-compete agreement when she signed it and sent it back to Generations Salon. Tr. at 4-5.

Marvin Weinstein also testified regarding the non-compete agreement. He denied ever seeing a copy of the non-compete agreement with the handwritten notation and denied ever agreeing to that term. Id. at 26. Marvin Weinstein signed the non-compete agreement on behalf of Generations Salon. Id. The only fully executed non-compete agreement in the record is that provided by Generations Salons which does not include the additional term. Complaint, Attach. 1. As such, the evidence does not support a finding that Generations Salon agreed to this additional term. For the purposes of resolving the Motion, the Court accepts the terms of the fully executed covenant-not-to-compete.

¶ 46.[12]  However, at the time they formed Silver Salons in November 2016, both Cangemi

and Calianno had the intention of entering into the senior salon services industry.  Tr. at

11.

By February 1, 2017, Silver Salons had already signed contracts with two

communities, Bay View and Anthem Lakes.  Tr. at 12-13.  Silver Salons solicited and is

now serving at least one other former client of Generations Salon – that is Rose Tree

Place in Pennsylvania – and is in direct competition with Generations Salon in the senior

salon services industry.  Complaint at ¶ 52; Reply, Attach. 3 at ¶¶ 13-14 (Allyson DeNardo

Decl.).  As of the date of the Cangemi and Calianno declarations, Silver Salons was

providing senior salon services to ten customer communities, nine in Florida and one

(Rose Tree Place) in Pennsylvania.  Cangemi Decl. at ¶ 11.[13]  In their declarations,

Cangemi and Calianno assert that all of their customers are well established and have

been in business for several years.  Cangemi Decl. at ¶ 11; Calianno Decl. at ¶ 11.

---

[12] In its Reply, Generations Salon explains that Calianno informed the company's Business Office Manager, Allyson DeNardo,that Calianno was going to be working full time at Ulta, a beauty retail store.  Reply, Attach. 3 at ¶ 24.

[13] Generations Salon asserts, based on the declaration of Allyson DeNardo ("DeNardo") that Silver Salons is serving another former client, The Meridian.  Reply at 2; id., Attach. 3 at ¶¶ 12-14; id., Attach. 1 at ¶¶ 3-7 (Marvin Weinstein Decl.).  It also suggests that as a result of Cangemi and Calianno's marketing of Silver Salons, Generations Salon is soon to lose "up to 10 additional communities within the next two weeks." (the Sunrise Communities).  Reply at 3; Reply, Attach. 3 at ¶¶ 7-10.  DeNardo's statements regarding these matters are based on conversations she had with other persons not before the Court, who were not under oath at the time the statements were made and whose basis of knowledge is unknown and cannot be tested.  In response, Cangemi testified under oath before the Court and emphatically denied that she, Calianno, or anyone on behalf of Silver Salons is performing services at The Meridian or has solicited business from the Sunrise Communities.  The Court will accept Cangemi's testimony for purposes of resolving the Motion and disregard the conflicting portions of DeNardo's declaration.  Generations Salon also asserts that Cangemi and Calianno have solicited stylists in violation of their restrictive covenants.  Motion at 13.  However, Generations Salon's only evidence of this is the fact that former stylists are employed by Silver Salons and DeNardo's belief that an unidentified person who gave a group of stylists the cell phone number of Lee Weinstein, Director of Sales and Marketing at Generations Salon was Calianno.  DeNardo Decl. at ¶¶ 25-27.  DeNardo has no information as to how the stylists came to be employed at Silver Salons and her personal belief is not evidence.  Cangemi and Calianno have affirmatively denied soliciting any former Generations Salon stylists.  Thus, the evidence before the Court fails to support a finding that Cangemi and Calianno, on their own or through Silver Salons, are soliciting Generations Salon's stylists.

However, at the hearing, Cangemi testified that Anthem Lakes was a "brand new building." Tr. at 13.

On October 10, 2017, Generations Salon filed suit against Cangemi, Calianno, and Silver Salons. Complaint at 1. Generations Salon accuses Cangemi and Calianno of breaching the terms of their non-compete agreements, breaching their fiduciary duties, violating the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, as well as violating Florida's Uniform Trade Secrets Act, FLA. STAT. § 688.001. In particular, Generations Salon asserts that what differentiates it from its competitors is

> the information Generations Salon has developed about its customers and prospective customers, the stylists who contract with Generations Salon to perform services at the communities where Generations Salon provides services, customer pricing and discounting strategies, marketing strategies, supplier information, specific considerations relating to the resident populations at Generations Salon's customers and their respective buying habits, and a host of additional information that is unknown and not readily ascertainable by Generations Salon's competitors, all of whom could benefit from the disclosure or use of this information.

Id. at ¶ 24. Generations Salon considers this information to constitute its trade secrets, much of which is kept and maintained in its proprietary database (the "Stanglware" database – named after its creator, Fred Stangl). Id. at ¶ 25. One means by which Generations Salon protects its information is by requiring employees who have access to it, like Cangemi and Calianno, to sign non-compete agreements. Id. at 26.

Cangemi and Calianno deny knowledge of or access to the Stanglware database, or any other proprietary database maintained by Generations Salon. See Cangemi Decl. at ¶ 16; Calianno Decl. at ¶ 16. However, Generations Salon has presented evidence that Calianno received regular reports generated from the Stanglware database which included sales amounts for each community served and commissions stylists were

claiming from each community served. DeNardo Decl. at ¶¶ 20-23. Calianno did not seek to contest this statement. Additionally, Cangemi, as Generations Salon's Director of Business Development, had access to similar information, Complaint at ¶ 27, an assertion she has not disputed.

Generations Salon further alleges that Silver Salons has "solicited and diverted several of Generations Salon's clients and former clients," and is now in direct competition with Generations Salon. Complaint at ¶ 52. Generations Salon also avers that

> Defendants have disclosed and used and will inevitably disclose and use . . . the following types of trade secret information which they learned by virtue of their respective employment with Generations Salon: (i) high level contacts with decision makers; (ii) potential customers Generations Salon has targeted and plans to target; (iii) market growth opportunities; (iv) Generations Salon's strengths and weaknesses with its customers; (v) specific products, vendors, and arrangements with third parties that may increase profitability; (vi) other information which, collectively, will result in Silver Salons being able to shortcut what it has taken Generations Salon years of labor and expense to build.

Id. at ¶ 57.

Neither Cangemi nor Calianno has a list of Generations Salon's clients or stylists. Cangemi Decl. at ¶¶ 9, 11; Calianno Decl. at ¶¶ 10, 12. Each asserts that "I did not learn anything from Generations that I didn't already know from working in the industry. I acquired this knowledge from my personal experience and from my previous employers, including Salon P.S. . . ." Cangemi Delc. at ¶ 8; see also Calianno Decl. at ¶ 9. Both women also assert that they garnered some of their knowledge regarding the senior salon service industry by attending the "national and local 'Leading Age' industry conference(s) where speakers and industry insiders discuss and educate professions in senior specific industries, including senior salon services." Cangemi Decl. at ¶ 8; Calianno Decl. at ¶ 9.

Finally, Cangemi notes that

> I am a single mother of three and . . . support my 83-year old father who resides with me. I have no income other than Silver Salons & Spas, LLC. I have worked in the senior salon services industry for the last 15 years – this is all I know. I spent my entire savings to start Silver Salons & Spas, LLC, and if I am prevented from working in the industry, I will lose everything.

Cangemi Decl. at ¶ 17. Similarly, Calianno asserts that

> I am a single mother with a 4-year old son and I receive no child support. I have no income other than Silver Salons & Spas, LLC. I've put everything I have into Silver Salons & Spas, LLC and if I am prevented from working in the industry, I will lose everything.

Calianno Decl. at ¶ 17.

## III.  <u>Summary of Arguments</u>

As a result of Cangemi and Calianno's alleged activities, and in support of its Motion for a Preliminary Injunction, Generations Salon asserts that it is necessary to enforce the non-compete agreements both women signed in order to protect Generations Salon's legitimate business interests. Motion at 13. Specifically, Generations Salon seeks to protect its

> customers and prospective customers, the stylists who contract with Generations Salon to perform services at the communities where Generations Salon provides services, customer pricing and discounting strategies, marketing strategies, supplier information, specific considerations relating to the resident populations at Generations Salon's customers and their respective buying habits.

Motion at 6. Likewise, Generations Salon asserts that it will suffer irreparable injury if the Defendants are not enjoined. <u>Id.</u> at 12. In particular, the company claims that

> [t]he injury here is not speculative, it is already occurring. . . . [Cangemi and Calianno] are competing in Generations Salon's markets, in a direct capacity, in a specialized industry, and are armed with Generations Salon's confidential and trade secret information. Upon information and belief, Cangemi and Calianno have already diverted customers and

-10-

> independent contractors from Generations Salon, using their knowledge
> gained by being entrusted employees at Generations Salon.

Id. at 13.[14]

In response, Defendants claim that their actions have not caused irreparable harm to Generations Salon. They argue that "[p]laintiff has failed to identify a single customer that Defendants have solicited or a single customer that Plaintiff has lost or stands to lose by virtue of Defendants' actions." Response at ¶ 6. They further assert that they "have not solicited and do not intend to solicit Plaintiff's customers." Id.

Defendants also argue that the non-compete agreements they signed are not supported by any legitimate business interests. Id. at ¶¶ 11-20. Specifically, Defendants assert that the alleged trade secrets and confidential information Generations Salon claims they have "disclosed and used and will inevitably disclose and use," Complaint at ¶ 57, are not properly characterized as trade secrets or confidential information. Defendants claim that Generations Salon's purported protected "customer lists," contain information that is publicly available from state health care regulation websites as well as websites of associations relating to the health care industry. Response ¶ 13. Similarly, Defendants assert that they did not solicit Generations Salon's stylist lists, but rather sought and employed stylists by virtue of placing an advertisement on Craigslist. Id. at ¶ 14.

As to Generations Salon's claim that it has a protected interest in its customer pricing, discounting strategies, supplier information, marketing strategies, and resident populations and their respective buying habits, id. at ¶¶ 15-20, Defendants assert that

---

[14] In its Motion, Generations Salon also argues that it satisfies all the elements for obtaining preliminary injunctive relief (e.g., likelihood of success on the merits, irreparable harm, balance of harms, pubic interest).

most if not all of this information is generally available or common knowledge within the industry. Id. They also assert that because of the commonplace nature of Generations Salon's information, there is nothing unique or proprietary about what they are trying to protect. Id. at ¶ 17. Finally, Defendants challenge any assertion made by Generations Salon that their actions have undermined the "good will" value of Generations Salon. Id. at ¶ 23. Notably however, Defendants do not address Generations Salon's assertions regarding its legitimate business interests in its customer relationships. Finally, Defendants assert that, in determining the proprietary of granting a preliminary injunction to Generations Salon, the Court must evaluate the balance of harms which they argue weighs in favor of Cangemi and Calianno. Response at ¶¶ 21-22. As such, Defendants contend the Motion should be denied.

In its Reply, Generations Salon first notes that by Defendants' own admissions, Cangemi and Calianno, through Silver Salons, are already in direct competition with it by obtaining clients in the same geographic regions in which Generations Salon serves communities. Reply at 1-2. Second, Generations Salon provides more specificity as to the clients it has already lost to Silver Salons, and to the future clients it may lose.[15] Generations Salon also asserts that the information deemed as "confidential" in the non-compete agreements with Cangemi and Calianno does constitute a legitimate business interest. Id. at 3-5. In this regard, Generations Salon asserts that its client lists are not merely made up of generally publicly available information, but rather exist because of the "industry" and "compiling" efforts of Generations Salon. Id. at 4; id. at Attach 1 at ¶ 14 (noting lists contain key decision makers, and appropriate "pitches" to make).

---

[15] In addressing this argument, the Court does not consider any evidence excluded based on the Court's resolution of the Defendants' Motion to Treat Documents as Non-Trade Secrets.

In addressing whether Silver Salons was soliciting its stylists, Generations Salon notes that its Business Office Manager, Allyson DeNardo, spoke to a number of its stylists, who had obtained the phone number of Lee Weinstein, Director of Sales and Marketing at Generations Salon. DeNardo Decl. at ¶ 25. The stylists said they obtained the number from a "former manager" of Generations Salon, which DeNardo interpreted to mean Calianno. Id. The stylists allegedly "threatened to go work for this 'former manager,' who they stated was going to take over all of Generations Salon's 'old contracts.'" Id. at ¶ 27.

In response to Defendants' arguments regarding financial arrangements, use of coupons, discounts, etc., suppliers, marketing strategies, and resident populations and their buying habits, Response at ¶¶ 16-20, Generations Salons generally asserts that all this information is indeed unique and warrants protection. Finally, Generations Salon asserts that in addressing the balance of harms prong when determining whether to grant a preliminary injunction, the Court should apply the standard laid out in Florida Statutes section § 542.335(1)(g). Reply at 5-6.

## IV. Applicable Law

### a. Preliminary injunction standard

Generally, a preliminary injunction is an extraordinary and drastic remedy. See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); see also Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1300 (11th Cir. 2001). Indeed, "[a] preliminary injunction is a powerful exercise of judicial authority in advance of trial." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1284 (11th Cir. 1990). Thus, in order to grant a request for preliminary injunctive relief, the movant bears the burden to clearly establish the following: "(1) a substantial

likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the [movant] outweighs the harm an injunction may cause the [opposing party], and (4) that granting the injunction would not disserve the public interest." Am. Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407, 1410 (11th Cir. 1998); see also Davidoff & CIE, S.A., 263 F.3d at 1300; McDonald's Corp., 147 F.3d at 1306; Ne. Fla., 896 F.2d at 1284-85. The movant, at all times, bears the burden of persuasion as to each of these four requirements. See Ne. Fla., 896 F.2d at 1285. And the failure to establish an element, such as a substantial likelihood of success on the merits, will warrant denial of the request for preliminary injunctive relief and obviate the need to discuss the remaining elements.[16] See Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th Cir. 1994)); Del Monte Fresh Produce Co. v. Dole Food Co., 148 F. Supp. 2d 1326, 1339 n.7 (S.D. Fla. 2001).

When, as in this case, the party moving for a preliminary injunction is doing so on the basis of a state law violation (e.g., the violation of a state law covenant-not-to-compete), general Erie principles apply. Accordingly, state law will guide substantive matters (e.g., has a valid state law covenant-not-to-compete been violated), while federal law will address procedural matters (e.g., the issuance of a preliminary injunction). See TransUnion Risk & Alternative Data Solutions, Inc. v. MacLachlan, 625 Fed. Appx. 403, 406 (11th Cir. 2015); Ferrero v. Assoc. Materials Inc., 923 F.2d 1441, 1448-49 (11th Cir.

---

[16] Similarly, where a plaintiff fails to establish irreparable harm, the court need not address each element of a claim for preliminary injunctive relief. See Ne. Fla., 896 F.2d at 1285 (noting that "[a] showing of irreparable harm is the sine qua non of injunctive relief" and reversing the grant of such relief absent irreparable harm).

1991); <u>Quaker Chemical Corp. v. Varga</u>, 509 F. Supp. 2d 469, 478 n. 8 (E.D. Pa. 2007) (citing <u>Instant Air Freight Co. v. C.V. Air Freight, Inc.</u> 882 F.2d 797, 799 (3d Cir. 1989)).

       b. <u>Non-compete agreements</u>

       i. **Florida law (applicable to Cangemi's agreement)**

Under Florida law, a restrictive covenant in the employment setting is valid if the employer can prove "(1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer." <u>AutoNation, Inc. v. O'Brien</u>, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004). <u>See also</u> <u>Thyssenkrupp Elevator Corp. v. Hubbard</u>, No. 2:13-cv-202-FtM-29UAM, 2013 WL 5929132, *4 (M.D. Fla. Nov. 4, 2013); <u>CreditMax Holdings LLC v. Kass</u>, No. 11-81056-Civ Ryskamp/Vitunac, 2011 WL 13108061, *2 (S.D. Fla. Dec. 5, 2011); Fla. Stat. § 542.335(1)(b), (c). Florida statute section 543.335 further provides that a "legitimate business interest" includes, but is not limited to

> [t]rade secrets, as defined . . . [by state statute]; [v]aluable confidential business or professional information that otherwise does not qualify as trade secrets; [s]ubstantial relationships with specific prospective or existing customers, patients, or clients; [c]ustomer, patient, or client goodwill associated with: [a]n ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress"; [a] specific geographic location; or [a] specific marketing or trade area; [and] [e]xtraordinary or specialized training.

Fla. Stat. § 542.335(1)(b)(1)-(5).[17] <u>See also</u> <u>Electrostim Med. Servs. Inc. v. Lindsey</u>, No. 8:11-cv-2467-T-33TBM, 2012 WL 1405707, *6 (M.D. Fla. Mar. 13, 2012), <u>approved by</u>

---

[17] Under Florida law, trade secrets are defined as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons

No. 8:110CV02467-T-33TBM, 2012 WL 1405681 (M.D. Fla. Apr. 23, 2012); <u>AutoNation, Inc.</u>, 347 F. Supp. 2d at 1304; <u>Gould & Lamb, LLC v. D'Alusio</u>, 949 So. 2d 1212, 1213-14 (Fla. 2d Dist. Ct. App. 2007).  The statute also directs that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant."  FLA. STAT. § 543.335(1)(j).   However, that presumption is rebuttable.  <u>See</u> <u>H&M Hearing Assoc., LLC v. Nobile</u>, 950 So. 2d 501, 503 (Fla. 2d Dist. Ct. App. 2007).[18]

Finally, Florida law provides that "[a]ny restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable."  FLA. STAT. § 542.335(1)(b); <u>see also</u> <u>GPS Indus., LLC v. Lewis</u>, 691 F. Supp. 2d 1327, 1333 (M.D. Fla. 2010).  A party seeking to challenge the validity of a covenant not to compete "has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests."  FLA. STAT. § 543.335(1)(c); <u>Proudfoot Consulting Co. v. Gordon</u>, 576 F.3d 1223, 1231 (11th Cir. 2009); <u>Thyssenkrupp Elevator Corp.</u>, 2013 WL 5929132 at *4; <u>GPS Indus., LLC</u>, 691 F. Supp. 2d at 1333.

---

who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
FLA. STAT. § 688.002(4).

[18] To the extent Generations Salon contends that in determining whether to grant the injunctive relief, the Court should disregard any hardship suffered by Defendants, it is incorrect.  The Florida statute states that, "[i]n determining the enforceability of a restrictive covenant, a court: Shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought."  FLA. STAT. § 542.335(1)(g)(1).  <u>See also</u> <u>TransUnion Risk & Alternative Data Solutions, Inc.</u>, 625 Fed. Appx. at 407.  However, this provision in section 542.335(1)(g)(1) "governs the <u>enforceability</u> of restrictive covenants, not the <u>enforcement</u> of an already enforceable restrictive covenant," and therefore is not relevant when determining whether to grant or deny a preliminary injunction.  <u>Id.</u> at 407 (emphasis in original).  Hence, section 542.335(1)(g)(1) should only be considered for purposes of the validity of the covenant-not-to-compete, and not for whether an injunction should issue.

### ii. **Pennsylvania law (applicable to Calianno's agreement)**

Pennsylvania law does not differ significantly from that of Florida in how it evaluates the validity and enforceability of a restrictive covenant. Under Pennsylvania law, courts will enforce a covenant-not-to-compete where the covenant is "(1) . . . incident or ancillary to an employment relationship between the parties, (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer, and (3) the restrictions imposed are reasonably limited in duration and geographic extent." Omicron Sys., Inc. v. Weiner, No. 669 Aug.Term. 2001, Control 010320, 2002 WL 452238, *3 (Pa. Ct. Common. Pleas Mar. 14, 2002) (internal citations and quotations omitted). See also Healthcare Servs. Group, Inc. v. Fay, No. 13-66, 2013 WL 2245683, *5 (E.D. Pa. May 22, 2013); Viad Corp. v. Cordial, 299 F. Supp. 2d. 466, 476 (W.D. Pa. 2003); Vector Sec., Inc. v. Stewart, 88 F. Supp. 2d 395, 399-400 (E.D. Pa. 2000). Pennsylvania law further establishes that the legitimate business interests that can be protected by a covenant-not-to-compete include "trade secrets or confidential information, unique or extraordinary skills, customer good will, and investments in an employee specialized training program." WellSpan Health v. Bayliss, 869 A.2d 990, 998 (Pa. 2005). See also DeAngelo Bros., Inc. v. Clarius, No. 3:CV-06-0466, 2006 WL 7553206, *10 (M.D. Pa. Aug. 17, 2006) (same); Omicron Sys., Inc., 2002 WL 452238 at *3 (focusing on relationships established with customers); Viad Corp, 299 F. Supp. 2d. at 478 (focusing on "protection of . . . competitive advantage in the marketplace . . . [and] client accounts and customer relationships."); Vector Sec., Inc., 88 Fed. Supp. 2d at 400 (sustaining long term relationship with subscribers); Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Casualty Insurance Agency, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997) (including as

legitimate business interests "specialized program of coverages . . . developed, [and] the customer and distribution network developed").

When examining whether a party can obtain a preliminary injunction to enforce a valid covenant-not-to-compete, Pennsylvania law requires "actual proof of irreparable harm." <u>New Castle Orthopedic Ass'n. v. Burns</u>, 392 A.2d 1383, 1387 (Pa. 1978). However, the Pennsylvania courts have recognized a specific exception to this general proposition. Where a covenant is "designed to prevent a disturbance in the relationship that has been established between [a company] and its accounts through prior dealings," <u>John G. Bryant Co. Inc. v. Sling Testing & Repair, Inc.</u>, 369 A.2d 1164, 1167 (Pa. 1977), and the covenant is otherwise deemed to be reasonable under Pennsylvania law, it "is prima facie enforceable in equity." <u>Id.</u> As such, "where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant," <u>New Castle Orthopedic Ass'n.</u>, 392 A.2d at 1387, irreparable harm is established and the covenant can be enforced. <u>See</u> <u>John G. Bryant Co. Inc.</u>, 369 A.2d at 1167.

## V. Discussion

The threshold inquiry for the Court is whether Generations Salon has shown a likelihood of success on the merits of its claims against Cangemi and Calianno based upon the restrictive covenants. In this regard, the Court must determine whether the restrictive covenants seek to protect Generations Salon's legitimate business interests. Should the Court determine that the covenants do protect legitimate business interests, thereby permitting a presumption of irreparable harm, the Court must then consider

whether Cangemi and Calianno successfully rebut that presumption. Likewise, the Court must consider the balance of harms, and whether the public interest is served by entering a preliminary injunction.

    a. <u>Substantial likelihood of success in the enforcement of the non-compete agreements.</u>

As relevant to this action, in Florida, a valid covenant-not-to-compete must be supported by a "one or more legitimate business interests." FLA. STAT. § 542.335(1)(b). Similarly, Pennsylvania requires that any such "restrictions imposed by the covenant are reasonably necessary for the protection of the employer." <u>Omicron Sys., Inc.</u>, 2002 WL 452238, *3. Both states take the general approach that trade secrets, confidential information, good will, customer lists, and relationships with clients, all constitute legitimate interests which can be protected by covenants-not-to-compete. <u>See generally</u>, FLA. STAT. § 542.335(1)(b)(1)-(5); <u>WellSpan Health</u>, 869 A.2d at 998.

Here, Generations Salon asserts that

Defendants have disclosed and used and will inevitably disclose and use . . . the following types of trade secret information which they learned by virtue of their respective employment with Generations Salon: (i) high level contacts with decision makers; (ii) potential customers Generations Salon has targeted and plans to target; (iii) market growth opportunities; (iv) Generations Salon's strengths and weaknesses with its customers; (v) specific products, vendors, and arrangements with third parties that may increase profitability; (vi) other information which, collectively, will result in Silver Salons being able to shortcut what it has taken Generations Salon years of labor and expense to build.

Complaint at ¶ 57. Similarly, Generations Salon asserts the non-compete agreements both women signed are necessary to protect Generations Salon's legitimate business interests in terms of its

customers and prospective customers, the stylists who contract with Generations Salon to perform services at the communities where Generations Salon provides services, customer pricing and discounting

-19-

strategies, marketing strategies, supplier information, specific considerations relating to the resident populations at Generations Salon's customers and their respective buying habits.

Motion at 6. In response, Defendants generally assert that the alleged confidential or trade secret Generations Salon seeks to protect is publicly available information, or otherwise common knowledge within the industry.

For the purposes of resolving the Motion, the Court will focus on Generations Salon's contention that it possesses legitimate business interests in its relationships with current and past customers, its confidential client lists and other confidential business information, and its goodwill. On the current record, Generations Salon's allegations of needing to protect its trade secrets,[19] stylist lists, and supplier information, find far less support.

Cangemi and Calianno do not contest that Generations Salon has a legitimate business interest in its customer goodwill.[20] While they assert that the identities of Generations Salon customers are not confidential, they do not dispute that Generations Salon has substantial relationships with its current and prospective customers. Florida courts have held that a "substantial relationship is more likely to exist where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." IDMWORKS , LLC v. Pophaly, 192 F. Supp. 3d 1335, 1340-41 (S.D. Fla. 2016). Here, it

---

[19] Generations Salon asserts that it is seeking to protect its trade secrets. Motion at 3. However, the record currently before the Court is insufficient to determine if any of the information Generations Salon seeks to protect qualifies as a trade secret under Florida or Pennsylvania law. As such, the Court does not find, for the purposes of ruling on the current Motion, that the restrictive covenants are necessary to protect a legitimate business interest in Generations Salon's trade secrets.

[20] In the Response, Defendants argue that Generations Salon has failed to show that there is a substantial likelihood of loss of customer goodwill. Response at ¶ 23. However, they do not assert that Generations Salon's customer goodwill does not constitute a legitimate business interest entitled to protection.

is undisputed that Generations Salon enters into exclusive contractual relationships with its customers.  See Reply, Attach 2., Ex. B; see also Envtl. Servs., Inc. v. Carter, 9 So. 3d 1258, 1265 (Fla. 5th Dist. Ct. App. 2009) (substantial relationship with customer protected where former employees working with clients of former employer); compare Evans v. Generic Solution Eng'g, 178 So. 3d 114, 117 (Fla. 5th Dist. Ct. App. 2015) (lack of exclusive contract undermined existence of substantial business relationship).  It is also undisputed that Generations Salon has active ongoing relationships with its customers. Thus Generations Salon has established a legitimate business interest in its substantial relationships with its customers.

Next, the Court turns to the parties' dispute as to whether Generations Salon has established that the information it has identified constitutes confidential business information entitled to protection via an enforceable restrictive covenant.  It is generally established in Florida that "information that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." CreditMax Holdings, LLC, 2011 WL 13108061 at 3; see also GPS Indus., LLC, 691 F. Supp. 2d at 1335.  Also, the mere identity of clients or pricing terms "may not be sufficient to justify a restrictive covenant," where the employer fails to show that this data derives "economic value from not being readily ascertainable by others who can obtain economic value from their disclosure."  Id.; see also Gould & Lamb, LLC, 949 So. 2d at 1214 (employer's broad statements of concern to protect "marketing plans, product plans, business strategies, financial information, forecasts, and the like" insufficient to establish legitimate business interest); Proudfoot Consulting Co., 576 F.3d at 1234 n.11 (suggesting that mere identity of clients may not rise to the level of a legitimate business

interest); <u>Thyssenkrupp Elevator Corp.</u>, 2013 WL 5929132 at *5 (alleged "confidential information" that is readily accessible from other sources does not constitute a protectable legitimate business interest).

Conversely, business information which is not otherwise readily available to the public, or has been acquired or compiled through the industry of a party, can be deemed a protected legitimate business interest. <u>See e.g.</u>, <u>Electrostim Med. Servs. Inc.</u>, 2012 WL 1405707 at *8 (customer database that contains unique and specific information regarding customers, where such information is not publicly available, constitutes a protectable legitimate business interest); <u>Proudfoot Consulting Co.</u>, 576 F.3d at 1234 ("when employee has access to confidential business information crucial to the success of an employer's business, that employer has a strong interest in enforcing a covenant not to compete"); <u>AutoNation, Inc.</u>, 347 F. Supp. 2d at 1305 (company's highly specialized information not otherwise publicly available, including Best Practices policies, Peer Performance Reports, information disclosed at Monthly Operating Review Meetings, constituted protectable legitimate business interests under a covenant not to compete); <u>Atomic Tattoos, LLC v. Morgan</u>, 45 So. 3d 63, 65 (Fla. 2d Dist. Ct. App. 2010) (client list that contained unique information including how far clients lived from tattoo studio constituted a protectable legitimate business interest under a covenant-not-to-compete); <u>Open Magnetic Imaging, Inc. v. Nieves-Garcia</u>, 826 So. 2d 415, 419 (Fla. 3d Dist. App. 2002) (customer database, which contains customer idiosyncrasies, as well as information as to referral patterns, preferences, and insurance accepted, was a protected legitimate business interest); <u>Kavanaugh v. Stump</u>, 592 So. 2d 1231, 1232 (Fla. 3d Dist. Ct. App. 1992) (customer information can qualify as a legitimate business interest where

the information is acquired or compiled through the industry of the employer and is not just a compilation of information commonly available to the public); AutoNation, Inc. v. Maki, No. 03-18896 CACE(03), 2004 WL 1925479 (Fla. Cir. Ct. Aug. 25, 2004) (company's highly specialized information not otherwise publicly available, including Best Practices policies, Peer Performance Reports, information disclosed at Monthly Operating Review Meetings, constituted protectable legitimate business interests under a covenant not to compete).

Pennsylvania law is generally consistent with that of Florida as to both confidential business information and protecting customer relationships. See e.g., Synthes, Inc. v. Gregoris, 228 F. Supp. 3d 421, 430 (E.D. Pa. 2017) (employers possess legitimate business interest in confidential information as well as protecting customer relations); HR Staffing Consultants LLC v. Butts, 627 Fed. Appx. 168, 174-75 (3d Cir. 2015) (plaintiff's ability to protect confidential information "essential to its very existence, and money will not remediate the injury if its business model is destroyed"); Quaker Chem. Corp., 509 F. Supp. 2d at 478 (legitimate business interest includes confidential information); Intermetro Indus. Corp. v. Kent, No. 3:CV–07–0075, 2007 WL 1140637, *8 (M. D. Pa. Apr. 17, 2007) (finding irreparable harm when former employee was exposed to confidential information, even though he retained only a general understanding of the information); Hudson Global Resources Holdings, Inc. v. Hill, No. 02:07CV0132, 2007 WL 1545678, *9 (W.D. Pa. May 25, 2007) ("Courts will protect an employer by issuing injunctive relief to enjoin and restrain a former employee from using or disclosing the employer's confidential information and trade secret information to the employer's competitors."); DeAngelo Bros., Inc., 2006 WL 7553206 at *10 (goodwill and maintaining close relationships with

clients a legitimate business interest); <u>Viad Corp.</u>, 299 F. Supp. 2d at 477-79 ("to the extent that it seeks to preserve customer relationships and . . . goodwill . . . , the restrictive covenants . . . are reasonable necessary for the protection of . . . legitimate business interests); <u>Rollins Protective Servs. Co. v. Shaffer</u>, 557 A.2d 413, 414 (Pa. 1989) (given that "customer contact was crucial to . . . business, it was reasonable . . . to seek protection from former employees . . . whose sole job was to maintain close affiliations with prospective customers."); <u>John G. Bryant Co.</u>, 369 A.2d at 1167-68 (recognizing the importance of "preventing a disturbance in the relationship that has been established between [the employer] and their accounts through prior dealings."); <u>compare</u> <u>DeAngelo Bros, Inc.</u>, 2006 WL 7553206 at *10 (preventing competition alone is not a legitimate business interest).

In its Reply, Generations Salon asserts that its Stanglware data is unique in that it was "compiled" and created by the "industry" of Generations Salon, Reply at 4, and that this data also contains non-publicly available information such as the identities of key decision makers and what "pitches" to make. <u>See</u> Reply, Attach. 1 at ¶ 14; <u>see also e.g.</u>, <u>Electrostim Med. Servs. Inc.</u>, 2012 WL 1405707 at *8; <u>Atomic Tattoos, LLC</u>, 45 So. 3d at 65; <u>Open Magnetic Imaging, Inc.</u>, 826 So. 2d at 419; <u>Kavanaugh</u>, 592 So. 2d at 1232. Although Defendants contend that Generations Salon's alleged confidential information is generally available, the evidence before the Court does not support such a finding. While the identities of senior communities and their corporate owners is certainly information that is readily available, the identity of specific decision makers and their contact information does not appear to be so available. Indeed, an e-mail from Cangemi to Lee Weinstein shows that she could not find the phone number for a key contact for a

potential customer community because the company only "list[ed] an 877# online."  Reply, Attach. 1, Ex. A.  Moreover, the evidence does not suggest that the information Generations Salon claims to have compiled about customers, their preferences, its contracts with them, and their resident populations, would be readily available.  Nor does it suggest that Generations Salon's marketing strategies would be readily available. Thus, the evidence before the Court at this time would support a conclusion that Generations Salon possesses confidential business information that it has compiled, is not otherwise readily available to its competitors and derives value from being confidential.

While "protection of an employer from ordinary competition is not a legitimate business interest," Evans, 178 So. 3d at 116; see also DeAngelo Bros, Inc., 2006 WL 7553206 at *10 (preventing competition alone is not a legitimate business interest), the evidence presented by Generations Salon suggests more than just mere competition.  On this record, Generations Salon has shown a substantial likelihood of establishing that it has confidential business information entitled to protection pursuant to Florida Statute section 542.335 and Pennsylvania law.  See e.g., Thyssenkrupp Elevator Corp., 2013 WL 5929132 at *5; Electrostim Med. Servs. Inc., 2012 WL 1405707 at *8; Quaker Medical Corp., 509 F. Supp. 2d at 479; Intermetro Indus. Corp., 2007 WL 1140637 at *7; AutoNation, Inc., 347 F.Supp.2d at 1305; Atomic Tattoos, LLC, 45 So. 3d at 65; Open Magnetic Imaging, Inc., 826 So. 2d at 419; Kavanaugh, 592 So. 2d at 1232; AutoNation, Inc., 2004 WL 1925479 at *7.  Moreover, the record demonstrates that Cangemi and Calianno had access to Generations Salon's confidential business information, and that Silver Salons benefits from their access to, and knowledge of, that information.

As such, Generations Salon has established a substantial likelihood of success on its claim that the restrictive covenants it seeks to enforce are necessary to protect its legitimate business interests in its customer relationships, confidential information, and goodwill. Thus, Generations Salon satisfies the preliminary injunction requirement of showing that it is likely to succeed on the merits of its breach of contract claims against Cangemi and Calianno.[21]

      b. Irreparable harm

Ordinarily, to demonstrate irreparable harm, a party must show "that the injury cannot be undone through monetary remedies." Winmark Corp. v. Brenoby Sports, Inc., 32 F. Supp. 3d 1206, 1223 (M.D. Fla. 2014) (quoting Anago Franchising, Inc. v. C.H.M.I., Inc., No. 09-60713-cv, 2009 WL 5176548, at *11 (S.D. Fla. Dec. 21, 2009)). See also Viad Corp., 299 F. Supp. 2d at 480 (laying out requirement for irreparable harm). However, under Florida Law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." FLA. STAT. § 543.335(1)(j). That presumption, of course, is rebuttable. See H&M Hearing Assoc., LLC, 950 So. 2d at 503. Similarly, Pennsylvania courts have found that irreparable harm is established for covenants designed to protect established business relationships that are otherwise deemed reasonable under Pennsylvania law. See New Castle Orthopedic Ass'n., 392 A.2d at 1387; John G. Bryant Co. Inc., 369 A.2d at 1167.

---

[21] Additionally, it appears that Cangemi and Calianno, through their creation of Silver Salons, are in direct competition with Generations Salon, and therefore in violation of the covenants-not-to-compete. Reply at 1-2.

Here, Generations Salon asserts in its Motion that

> Cangemi and Calianno formed a competing entity while they were <u>still</u> <u>employed</u> by Generations Salon and necessarily had access to Generations Salon's confidential and proprietary information. They are competing in Generations Salon's markets, in a direct capacity, in a specialized industry, and are armed with Generations Salon's confidential . . . information. Upon information and belief, Cangemi and Calianno have already diverted customers . . . from Generations Salon, using their knowledge gained by being entrusted employees at Generations Salon.

Motion at 13 (emphasis in original). In opposition, Cangemi and Calianno contend that the harms asserted by Generations Salon are unfounded. They argue that Generations Salon "fails to identify a single customer that Defendants have solicited or a single customer that Plaintiff has lost or stands to lose by virtue of Defendants' actions." Response at ¶ 6. Defendants further assert "that Defendants have not solicited and do not intend to solicit Plaintiff's customers." <u>Id.</u> Finally, the Defendants claim that in the eight months that Silver Salons has been in alleged competition with Generations Salon, Plaintiff cannot identify a single lost customer. <u>Id.</u> at ¶ 7. As such, Cangemi and Calianno assert they have successfully rebutted the presumption of irreparable harm.

The Court finds the Defendants' arguments unavailing. Generations Salon lost its client, Bay View, to Silver Salons. Tr. at 12-13. Bay View's contract with Generations Salons did provide that the paragraph prohibiting Bay View from soliciting Generations Salon employees did "not apply to Sheryl Cangemi." Reply, Attach. 2, Ex. B. Thus, Bay View could hire Cangemi. <u>Id.</u> However, neither the terms of that contract, nor the terms of Cangemi and Calianno's non-compete agreements allowed either to form a company to compete with Generations Salon and take Bay View or any other customer. <u>Id.</u>; Complaint, Exhibit A & B. Nonetheless, Cangemi and Calianno appear to have done precisely what their restrictive covenants prohibited. With knowledge of Generations

Salon's confidential business information, they have created a competing business to take one of Generations Salon's current customers, as well as exploited an opportunity to contract with a new customer in the industry.  Tr. at 12-14.[22]  Therefore, Generations Salon has presented evidence to support its assertion that "Cangemi and Calianno have already diverted customers . . . from Generations Salon, using their knowledge gained by being entrusted employees at Generations Salon."  Motion at 13.

Here, the limited record before the court supports a finding that since Cangemi and Calianno left Generations Salon, Bay View terminated its contract with Generations Salon.  Tr. at 12-13.  Cangemi and Calianno, who immediately before working at Generations Salon were employed as stylists, were not in the business of marketing senior salon services to communities in competition with Generations Salon.  After working at Generations Salon for almost a year, and armed with information regarding its successful business model, Cangemi and Calianno formed a competing company.  Within days of Cangemi and Calianno leaving Generations Salon, Silver Salons had two clients, Bay View, a current customer of Generations Salon, and Anthem, a newly established senior community.  Tr. at 13-14.  Moreover, after only eight months in business, Silver Salons has acquired ten customers, and is in direct competition with Generations Salon in Florida and Pennsylvania.  Tr. at 15-16.

The Court has found that Generations Salon has a substantial likelihood of success in establishing that its covenants-not-to-compete with Cangemi and Calianno protect its legitimate business interests in its confidential business information, customer

---

[22] Compare Evans, 178 So. 3d at 117-118 (no substantial relationship with customer found where facts indicated that customer at issue as a former customer, and had never maintained an exclusive relationship with the employer).

relationships, and goodwill. As such, Generations Salon is afforded a rebuttable presumption of irreparable harm under Florida law. FLA. STAT. § 542.335(1)(j). Cangemi and Calianno's unsuccessful attempt to assert that Generations Salon has not lost any customers does not rebut the presumption afforded to Generations Salon.[23] Defendants, with knowledge of Generations Salon's confidential information are directly competing with Generations Salons. See e.g., Proudfoot Consulting Co., 576 F.3d at 1238 (employee's access to, and potential use of, former employer's confidential information once employed by a direct competitor, allows for enforcement of global covenant-not-to-compete); Intermetro Indus. Co., 2007 WL 1140637 at *7 ("When the employer's protected interests include information that may be competitively harmful to the employer in any area it competes, then it is reasonable for a non-compete to extend to all areas the employer competes."); AutoNation, Inc., 2004 WL 1925479 at *7 (covenant-not-to-compete enforced where employee had access to confidential information and could use it while employed with a direct competitor of former employer).

Moreover, the purpose of Florida's rebuttable presumption of irreparable harm is to ensure that an employer, like Generations Salon, does not have to wait until it has been harmed by the loss of a specific customer in order to obtain an injunction. Indeed, such

---

[23] By contrast, in CreditMax Holdings, LLC, 2011 WL 13108061, the court found that a defendant had successfully rebutted the presumption of irreparable harm in the context of the plaintiff's claims that the defendant had violated a non-disclosure agreement by stealing and threatening to disclose work related e-mails. Id. at *3. The defendant rebutted by presumption through his

> averments that he has never disclosed, threatened to disclose, or improperly used the e-mails [at issue], and will not do so in the future. Notably, [plaintiff] CreditMax [did] not identify[y] a single instance of [defendant] Kass improperly disclosing or using the emails, nor has CreditMax shown any facts suggesting he will.

Id. As such, the defendant successfully rebutted the presumption of irreparable harm. CreditMax is inapposite here. Generations Salon has shown a loss of customers in the context of a covenant not to compete, giving it grounds to seek to enforce that covenant, rather than merely in the context of a non-disclosure agreement.

a showing would place Generations Salon in a position of actually having to suffer damages that would be "difficult to measure with reasonable certainty," before obtaining an injunction to prevent such damages. Merrill Lynch, Pierce, Fenner & Smith v. Dunn, 191 F. Supp. 2d 1346, 1354 (M.D. Fla. 2002); see also New Horizons Computer Learning Ctr., Inc. v. Silicon Valley Training Partners, Inc., No. 2:02CV495FTM29SPC, 2003 WL 23654790, *7 (M.D. Fla. Nov. 12, 2013) ("When the failure to grant injunctive relief creates the possibility of a permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong has been satisfied."); Atomic Tattoos, LLC, 45 So. 3d at 66 (injunction appropriate as calculating loss from breach of covenant-not-to-compete "would be nearly impossible to calculate, particularly with a continuing breach").

Permitting Cangemi and Calianno to operate their business in direct competition with Generations Salon, and in direct violation of the covenants-not-to-compete they signed, presents a harm that is irreparable. In this regard, the decision in Medi-Weightloss Franchising USA, LLC v. Sadek, No. 8:09-cv-2421-T-24MAP, 2010 WL 1837767 (M.D. Fla. Mar. 11, 2010), approved by No. 8:09-cv-2421-T-24-MAP, 2010 WL 1837764, *3 (M.D. Fla. Apr. 29, 2010), is instructive. There, the court explained that the plaintiff had

> shown it has and will continue to suffer irreparable harm if a preliminary injunction does not issue as to [Defendants]. Namely, [Plaintiff] has shown that if a preliminary injunction does not issue, it will have to compete with former franchisees and employees who agreed not to engage in such competition, will lose exclusivity and confidentiality of its proprietary and confidential information, . . . , and will prevent [Plaintiff] from enforcing its agreements with other franchisees.

Id. at *7. The court's reasoning is equally applicable here. See also e.g., DePuy Orthopedics, Inc. v. Waxman, 95 So. 3d 928, 940 (Fla. 1st Dist. Ct. App. 2012)

(preliminary relief appropriate to maintain "long standing relationships and preserving the good will a company has built up over the course of years of doing business"); <u>Variable Annuity Life Ins. Co. v. Hausinger</u>, 927 So. 2d 243, 245 (Fla. 2d Dist. Ct. App. 2006) (statutory presumption of harm includes "the potential damage to [plaintiff's] longstanding relationships with its customers and the protection of confidential client information.").

While Pennsylvania law does not provide the same type of presumption of irreparable harm by statute, case law supports the premise that a plaintiff can establish irreparable harm where a former employee has access to confidential business information that could allow that employee to be in direct competition with the former employer. <u>See e.g.</u>, <u>HR Staffing Consultants LLC</u>, 627 Fed. Appx. at 174-75 (plaintiff's ability to protect confidential information "essential to its very existence, and money will not remediate the injury if its business model is destroyed"); <u>Intermetro Indus. Corp.</u>, 2007 WL 1140637 at *8 (finding irreparable harm when former employee was exposed to confidential information, even though he retained only a general understanding of the information); <u>Fisher Bioservices, Inc. v. Bilcare, Inc.</u>, No. Civ. A. 06–567, 2006 WL 1517382, *20 (E. D. Pa. May 31, 2006) ("Within the Third Circuit, courts have found that injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages."); <u>Hudson Global Resources Holdings, Inc.</u>, 2007 WL 1545678 at *9 ("Courts will protect an employer by issuing injunctive relief to enjoin and restrain a former employee from using or disclosing the employer's confidential information and trade secret information to the employer's competitors."); <u>John G. Bryant Co.</u>, 369 A.2d at 1167-

68 (recognizing the importance of "preventing a disturbance in the relationship that has been established between [the employer] and their accounts through prior dealings.").

Given that the Court has determined that Generations Salon has shown a substantial likelihood of success in establishing that its non-compete agreements protect legitimate business interests in its customer goodwill, customer relationships, and confidential business information, Generations Salon is entitled to a presumption of irreparable harm. Defendants have failed to rebut this presumption under Florida Law, and Generations Salon has satisfied its burden of showing, under Pennsylvania law, that it will suffer irreparable harm. Thus, for the purpose of this Motion, as to both Cangemi and Calianno, Generations Salon has shown that it will suffer irreparable harm if the non-compete agreements are not enforced by way of a preliminary injunction.[24]

      c. <u>Balance of harms</u>

The Court must now examine whether "the threatened injury to [Generations Salon] outweighs the harm an injunction may cause [Cangemi and Calianno]." <u>Am. Red Cross</u>, 143 F.3d at 1410. Generations Salon has already lost one current client, as Bay View is now working with Silver Salons. Tr. at 12-13. Likewise, Generations Salon is suffering the on-going loss of its confidential business information which it has developed and collected over its 25 years in business, as Cangemi and Calianno have established a competing business that is patterned closely after Generations Salon's own business model. <u>See e.g.</u>, <u>AutoNation, Inc.</u>, 347 F. Supp. 2d at 1308 (competitor's use of plaintiff's confidential business information "would provide an unfair advantage to the competitor's efforts to compete with" plaintiff); <u>Medi-Weightloss Franchising USA, LLC</u>, 2010 WL

---

[24] Notably, neither Cangemi nor Calianno challenges the covenants-not-to-compete as overbroad or overlong.

1837767 at *7 (plaintiff's harm includes "competition with former franchisees and employees who agreed not to engage in competition, [and] loss of exclusivity and confidentiality of its proprietary and confidential information"). Conversely, Cangemi and Calianno represent that if they are enjoined from continuing to run and promote their business, they "will lose everything." Cangemi Decl. at ¶ 17; Calianno Decl. at ¶ 17.

"In the context of non-competition agreements . . . courts have held that enjoinment from something one has no right to is not a hardship." TransUnion Risk & Alternative Data Solutions, Inc. v. MacLachlan, No. 14-cv-81485, 2015 WL 12910652, *3 (S.D. Fla. Oct. 29, 2015). Here, on the limited record before the Court, it appears that Cangemi and Calianno "entered into valid agreements prohibiting the conduct [Generations Salon] seeks to enjoin," Merrill Lynch, Pierce, Fenner & Smith, 191 F. Supp. 2d 1346 at 1354, but nonetheless proceeded to violate those agreements. In weighing what some courts describe as a defendant's "self-inflicted injury" against Generations Salon's customer loss and use of its confidential business information, the Court would struggle to find that Cangemi and Calianno's harms outweigh those of Generations Salon. See e.g., 7-Eleven, Inc. v. Kapoor Bros. Inc., 977 F. Supp. 2d 1211, 1227 (M.D. Fla. 2013) (where defendant's alleged harm arises from defendant's own violation of restrictive covenant, balance tips in favor of plaintiff); Dunkin' Donuts Franchise Rest. LLC v. D & D Donuts, Inc., 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008) (same). Notably, while the agreements between Generations Salon and the Defendants bar Cangemi and Calianno from competing with Generations Salon within a particular geographic area for a specific period of time, nothing in the agreements prohibit either woman from returning to her former job as stylist, or establishing senior salons services outside the geographic scope

of the restrictive covenant.  See New Horizons Computer Learning Ctr., Inc., 2003 WL 23654790 at *7 (enforcing injunction would not entirely prohibit former employee from making a living in same market as employer).  Nevertheless, the ability of Cangemi and Calianno to support their families is of concern to the Court.  To address this issue, at the Preliminary Injunction Hearing, Generations Salon suggested that if the Court was troubled by the balance of harms, the concern could be addressed by permitting Cangemi and Calianno to continue to operate salon services and serve any customers obtained to date, but be enjoined from any further competition for the term of their non-compete agreements.  The Court is of the view that with that suggested modification, the balance of harms analysis weighs in favor of Generations Salon.

        d.  The public interest

Finally, the Court must address whether granting the preliminary injunction would serve the public interest.  Am. Red Cross, 143 F.3d at 1410.  Florida courts recognize that the public has an interest in the enforcement of restrictive covenants.  See AutoNation, Inc., 347 F. Supp. 2d at 1308 (public policy favors enforcement of reasonable covenants not to compete); New Horizons Computer Learning Ctr., Inc., 2003 WL 23654790 at *7 (public has interest in enforcement of restrictive covenants); N. Am. Prods. Corp. v. Moore, 196 F. Supp. 2d. 1217, 1231-32 (M.D. Fla. 2002) (same); Atomic Tattoos, LLC, 45 So. 3d at 66 (same).  Pennsylvania law is similar.  While Pennsylvania courts are "reluctant to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade," Coventry First, LLC v. Ingrassia, No. CIV.A.05-2802, 2005 WL 1625042, *12 (E.D. Pa. July 11, 2005) (internal citations and quotations omitted), the courts nonetheless recognize that "it is generally in

the public interest to uphold an agreement freely entered into by the parties." Id. (internal citations and quotations omitted). Additionally, the failure to uphold a restrictive covenant "would encourage . . . other employees to violate their restrictive covenants. Restrictive covenants only have value if they are enforced." Quaker Chem. Corp., 509 F. Supp. 2d. at 481 (internal citations and quotations omitted). See also Tantopia Franchising Co. LLD. v. West Coast Tans of PA, LLC, 918 F. Supp. 2d 407, 420 (E.D. Pa. 2013) (recognizing public interest in enforcing covenants-not-to-compete in the context of a franchise system); Intermetro Indus. Corp., 2007 WL 1140637 at *9 (noting public interest in enforcing covenants-not-to-compete); Vector Sec., Inc., 88 F. Supp. 2d at 402 (noting public interest served in upholding restrictive covenant). Consequently, the Court finds that the public interest is furthered by enforcing the restrictive covenant against Cangemi and Calianno.

As a result of the foregoing, the Court concludes that Generations Salon has satisfied the requirements for a preliminary injunction and hence the Motion is due to be granted. Accordingly, the Court must also consider the question of an appropriate bond.

### e. Bond

Rule 65(c), Federal Rules of Civil Procedure 65(c), and Florida statute section 542.335(1)(j), provide that a preliminary injunction should not issue "without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined." N. Am. Prods. Corp., 196 F. Supp. 2d. at 1232. Neither party addressed the question of bond in their submissions. Nevertheless, the Court determines that Generations Salon must file a surety bond in the amount of two hundred thousand dollars ($200,000), within seven business days of this

Order. Upon the filing of the bond, this preliminary injunction shall be effective, and shall continue in effect, but not exceed 360 days from the date of this Order. <u>See generally</u>, <u>TransUnion Risk & Alternative Data Solutions, Inc.</u>, 2015 WL 12910652 at *4 (length of covenant-not-to-compete applied from date of court order); <u>Leedom Mgmt. Group Inc. v. Perlmutter</u>, No. 8:11-cv-2108-T-33TMB, 2012 WL 1988190, *4 (M.D. Fla. June 4, 2012) (same); <u>N. Am. Prods. Corp.</u>, 196 F. Supp. 2d at 1220 (same); <u>Polaris Pool Sys., Inc. v. Great Am. Waterfall Co.</u>, No. 8:05CV1679TTGW, 2006 WL 289118, *6 (M.D. Fla. Feb. 7, 2006) (same); <u>LCI Communications Inc. v. Wilson</u>, 700 F. Supp. 1390, 1399-1400 (W.D. Pa. 1988) (enforcing terms of covenant-not-to compete from date of court's order).

**IN CONCLUSION**, the Court finds that Generations Salon has established the four prerequisites for the entry of a preliminary injunction.

Accordingly, it is **ORDERED**:

1.  Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Incorporated Memorandum of Law (Doc. 3), which the Court construed as a Motion for Preliminary Injunction and Incorporated Memorandum of Law, is **GRANTED, in part, and DENIED, in part**.

    a. The Motion is **GRANTED** to the extent that the Court issues the preliminary injunction set out below.

    b. Otherwise, the Motion is **DENIED**.

2.  Within the time and geographic scope limitations set forth in paragraph 3, Defendants Sheryl Cangemi and Julie Calianno and those in active concert with them, including Silver Salons & Spas, LLC,  who receive actual notice of this Order by service or otherwise, are **ENJOINED** from:

a. Competing with Generations Salon by marketing, providing, or contracting to provide on-site professional salon and spa services to residents of any senior living communities, personal care and assisted living communities, and/or health care and nursing centers, except that Cangemi and Calianno are permitted to work as stylists for another employer in the senior salon services industry and may continue to provide services to any community for which they are providing services as the date of this Order;

b. Soliciting any of Generations Salon's customers to discontinue their affiliation with Generations Salon and/or to become affiliated with Defendants; and

c. Disclosing or using any of Generations Salon's "Confidential Information," as that term is defined in Cangemi's and Calianno's Non-Compete Agreements with Generations Salon;

d. Serving as an owner, shareholder, partner, officer, director, consultant, advisor, employee, or agent of any person or entity that engages in the activities that are defined in subparagraph (a) set forth above.

3. The scope of this Preliminary Injunction is limited to the following geographic region: Pennsylvania, Florida, Delaware, Virginia, Maryland, Texas, New Jersey, and/or New York. The Preliminary Injunction shall remain in effect for a period of 360 days, beginning on the date Plaintiff posts bond, unless the resolution of this litigation prior to the conclusion of that period extinguishes these requirements.

4.    Generations Salon and Defendants are hereby **ORDERED** to immediately preserve all documents and electronically stored information which contains any information relating to the claims raised in this action.

5.    Cangemi and Calianno are **ORDERED** to provide Generations Salon's counsel with a list of the customers Silver Salons is currently serving (and will continue to serve) no later than **five (5) days** after the issuance of this Order.

6.    The requirements of this Order shall be **effective immediately upon the posting by Generations Salon of good and sufficient security** with the Clerk of the Court in the amount of **two hundred thousand dollars ($200,000)** for the payment of such costs and damages as may be incurred or suffered by the Defendants should it later be determined that the Defendants were wrongfully enjoined or restrained, as required by Rule 65(c), Federal Rules of Civil Procedure.  Generations Salon shall file such security no later than **seven business days** after the issuance of this Order.

**DONE AND ORDERED** in Jacksonville, Florida, this 14th day of November, 2017.

**MARCIA MORALES HOWARD**
United States District Judge

lc26
Copies to:

Counsel of Record